Case number 20-1878, Donald Tucker v. Marquette County MI et al. Oral argument, 15 minutes per side. Ms. Heenan for the appellant. Oh, thank you, Ms. Foltz. We appreciate it. Ms. Keenan, have you reserved some time? Yes, Your Honor, I've reserved four minutes. Well, proceed. Thank you. Thank you. May it please the Court, Cynthia Heenan, on behalf of the estate of Clifford Tucker. The District Court erred in finding it was objectively reasonable for Rombach, that an objectively reasonable officer in Rombach's shoes would have perceived himself in immediate threat of serious harm when Rombach pulled his trigger. You've seen the video. You saw Tucker pick up the shotgun, swing it around and down to the floor. If Rombach had shot Tucker in that instance, he would have had a defense because he had only a split second to defend himself. And even if he'd shot two or three seconds after Tucker picked up the gun, he might still be entitled to qualified immunity because a reasonable officer may not have yet perceived that he was not, that the shotgun was no longer a threat. That's the Mullins case and Nelson v. Battle Creek. To Rombach's credit, that didn't happen. So now, for the next 10 to 11 seconds, the physical situation remains static as they spar verbally. Well, counsel, it wasn't exactly static, was it? Because Mr. Tucker actually moved toward Deputy Rombach, didn't he? Well, that's an interesting point, Judge Bush. According to the, there's a little bit of a dispute about how much he moved and whether it was forward. But you're not disputing that there was some movement towards the deputy? There, I would dispute that it was towards the deputy, but there was movement. But it's also important that the defendants have, or the defendant has made the point that Tucker had moved a whole three feet from the time he picked up the gun. There was constant motion. And that's my, the gist of my argument is that there is nothing about that one last step that changed the status quo. And also the deputy had told Tucker to put down to not do it. There have been repeated statements for him not to do whatever it where the officer said, don't, don't, don't, I assume, meaning don't shoot. And Tucker didn't shoot. But he moved. He, he was moving throughout the encounter. He wasn't ordered not to move. He was at most passively resisting. He wasn't actively resisting. The important point is he was ordered to drop the gun. He was ordered once to drop the gun when he first picked it up, just once. The rest of the commands were don't. But he didn't drop it, correct? He did not drop it. That's correct. And what about the, I'm sorry, go ahead, Judge Raedler. Okay. Well, that's okay. I was just going to say, I mean, would you agree that the facts really aren't that much in dispute here, right? We have the benefit of videotape. And so we can all see for correct. It's the inferences that are to be drawn from the facts and specifically whether or not the officer was in immediate danger of serious threat at that moment. That is the critical issue in this case and where I think the district court erred in its findings. So in some, in some cases, you know, in some cases we send, we, we, we will deny qualified immunity instead of case or trial because we don't have videotape evidence and there's a real dispute about what exactly was happening. That's not, in many ways, that's not really this case, right? Because we have the benefit of the, of the video. So we can all see for ourselves the critical facts. Well, I disagree with that because I think the, the fundamental issue here is whether or not an objective reasonable officer would have believed that he was in immediate danger. And although the district court judge drew the conclusion that he was, I believe that a jury could just as easily, and inferences have to be found in our favor, draw the conclusion that he was not. Nothing had changed of significance in the entire 10 or 11 seconds. So is your rule, is your rule that we can never grant summary judgment on qualified immunity? Even if we have a video that shows pretty graphically for, you know, unfortunately for better or worse, what exactly happened, we can never grant summary judgment in that circumstance? It always has to go to a jury? I wouldn't say not never, but even the district court acknowledged this was an extremely close case. Well, close case is different than whether we can actually decide it. And your rule seemed to be that if there's any possible inference that you might draw from the video that we shouldn't be resolving, we should be sending it to a jury. That's because inferences at this stage have to be drawn in fact in favor of the plaintiff. What do you consider to be the disputed issues of material fact that would prevent qualified immunity here? Well, as I view the video, Tucker was doing exactly what he was told to do, which was not to shoot. And he did not make any move at all to pick up the weapon. He didn't lean in towards it. He didn't, his hand was not on the trigger. This is why it's so different from so many of the other cases that the court cited and district court cited. His hand wasn't on the trigger. He wasn't holding the weapon at waist level. It's not a pistol. I mean, it's a long gun. It's a shotgun. It's not a pistol or a rifle that could be aimed and shot with a flick of a wrist. He would have had to bend over, slide his hand down the stock to the trigger and lift up the gun at the same time. And I posit he couldn't have done both at the same time. There would have been plenty, if he had done any of those things, if he had even started to get the weapon into a position where he could use it, then officer Rombach had ample opportunity to defend himself. Because remember, he's standing there with his lock pointed at Tucker's chest the whole time. How far was Tucker from Rombach when he was shot? We don't have exact dimensions on it. I did include an exhibit that showed that the depth of the whole room was 16 feet. So my estimate would be that they were about five or six feet apart. Help us understand the clearly established law issue that would guide us both in any meet the second requirement of clearly established. What cases do you claim show that it was clearly established that this was an improper thing to do by Deputy Rombach? Well, thank you, Your Honor. There have been quite a number of cases already decided in the circuit. I mentioned Brandenburg versus Crewton. There's another one, Utah versus City of Lorraine. I don't think I cited that. That's 430 after 312. Bogus versus Mattingly, which said that the reasonableness of the use of deadly force is based on objective assessment of the danger the suspect poses at that moment. Margeson versus White County, Tennessee, and Boyd versus Biafler. And let me say also that the court should take notice of the Supreme Court's recent decision in Taylor versus Rojas. And also, this circuit has a very recent decision in Materwell versus Cuyahoga County. And both of those illustrate a trend of backing away from the prior requirement, as expressed by the circuit in Plumas, of having a case with an exact factual situation on all fours. The point is that the officer has notice of what's constitutionally permissible. And reaching back from Tennessee, Gardner, through all these cases I mentioned and dozens more, the analysis had been consistent and unchanging, that there had to be an immediate threat of serious physical harm to the shooting officer. Which case do you think is the closest to this one factually, that you cited? You know, I don't know factually. I think the point is that the officer had to be on notice of what was constitutionally permissible and unpermissible, as opposed to having a case on all fours. I understand your point that it doesn't need to be on all fours, but you would agree there has to be some parallel of the facts in prior case law to what we have here to deny qualified immunity. Then I would say Bogus versus Mattingly may be the closest. And there have been, of course, quite a number of cases since then that have all continued the same analysis. It's not that there's been some change or revision to the legal standard that was required. What case most completely addresses the issue of the position of the firearm? I think perhaps Margarson versus White County, Tennessee. And then more recently, Thomas versus Columbus and the Thornton case. And what role do those stand for? I think we're struggling with not just the presence of a weapon, but the usability of the weapon, those moments right before the officer fires. What is it about those cases that you would say establishes the law that Officer Lomback should have known? He should have known that mere possession or presence of a weapon is not enough to justify the use of force. He should have known that it had to be in a position where he could be harmed by the suspect before he would have a chance to defend himself. And, of course, it's also the position of Lomback's weapon that needs to be factored in here as well. I guess I would add to the mix, you know, we haven't talked a lot about, I mean, this is a totality of the circumstances test, correct? Correct. And we haven't really talked about the circumstances leading up to the points we have talked about. As I understand this, Tommy Destanis is wrong about this. The officer comes to the house. He's been to the house before. He knows the individual has called a hospital reporting potential suicidal thoughts. He argues with the individual. Individual sits in his chair, won't cooperate with the officer. Then the individual gets up, walks around the corner, reaches into a cabinet, pulls out a shotgun, and for a moment, at least, has that shotgun sort of request to drop the shotgun, continues to argue with the officer, and they're in a position where the officer really can't turn his back on the individual. The only way the officer could leave would be to turn his back on the individual. And the individual disobeys all those commands and is ultimately, unfortunately, shot by the officer. Was there anything wrong about that description of the events? Not fundamentally, but the fact that the presented the potential to harm the officer at one moment didn't mean that it persisted. He can't have shot him because he posed a threat 10 seconds earlier or half an hour earlier or whenever in their encounter. Yeah, so I could see that going the other way and that sort of no good deed goes unpunished. So he doesn't use his firearm. He shows restraint, doesn't use his firearm when shotguns momentarily hoisted him, but can't get the individual to cooperate, can't get the individual to calm down, and can't get him to drop his weapon, and he ultimately shoots him. I mean, in some ways, you would respect the officer for holding his fire, so to speak. I understand you want to call that constitutional violation. I could see someone seeing that the other way. He had backup on the way. As you can see in the video, they arrived within less than a minute. So it isn't as if they were going to have to stand there like that forever. There were two or three officers, and Rombach knew that. He'd communicated with them by radio, and he'd requested the expedited backup, and he knew where they were. So there just was not any... Our argument is that there was no exigency, nothing that had happened that required him to shoot at that moment. Any further questions? Thank you, Ms. Hainan. Mr. Curlew. Yes, thank you. Sorry, there's... We need to have everyone... Thank you. Douglas Curlew on behalf of Deputy Rombach and the county. I have not much that I could add over what was already laid out in my brief. I would just point out that there is a little bit of an issue on the standard as being stated by counsel. She said that it has to be a situation where the officer, a reasonable officer, would have believed he was in danger. I think the standard is really that the reasonable officer could have believed he was in danger. She also said at one point that the officer had to be in danger. Well, that's not true either. It's a perceive himself reasonably to be in danger. And other than mopping up that issue on the standard, I have really nothing to add but what's in the brief unless the panel has questions. I have a question. I'm struggling with that articulation of the facts because it seemed to me that what we had was Mr. Tucker picking up and swinging to his other arm the weapon, which would be the closest to it ever being positionally pointed at the officer. And then the business end, as we would say in Tennessee, of the rifle is pointed at the floor and his hand is on the butt or he's even resting on the butt. And there is an elapse of time that he is in that position. So help me understand under our law that relates to the importance of the position of the gun. In other words, the availability of a quick shot that would show an officer that that officer is in danger. How does that fit within this case? I have to confess that I have little experience with guns, but apparently a lot of people are more calm about them than I would be if I were standing in that situation. A shotgun doesn't have to be very well aimed to do its damage as I understand shotguns. And as the deputy pointed out in his deposition, well, it could have hit my foot without even being raised much from that position to the floor. If you look at the totality of the circumstances, you've got an individual who is clearly agitated, who has given the indication with his suggestion that he was going to commit suicide, that this firearm is in fact loaded, that he is refusing the officer's directives to stand down, to cease moving, to not be holding the weapon, and is taking these as I perceived them on the video, which is what the court should go by in its own, what it can see in half steps moving toward the officer with this gun in hand. I don't know that if I were the officer, I would have been looking specifically at where his hand was. I would have been watching a lot broader set of circumstances, particularly his face, his eyes as he was moving forward. As I pointed out in my brief, when one turns the sound off and gets away from the very captivating audio, there's a loose dog in the room, there's a coffee table down by his leg. There's a lot of circumstances beyond just where his hand is on the gun that the officer had to be perceiving. And in that room, I think it's in those totality of circumstances, I think it's very reasonable for an officer to have perceived that he was about to be in a situation where he was about to be fired, one that doesn't have to be terribly well-aimed to do its damage. How do you, just to follow up on Judge Stranch's question, how do you assess the position of the gun vis-a-vis other circumstances? Is that the most important circumstance? Is it an important circumstance? Is it one thing we just consider along with other factors? It's an important circumstance, but I don't think it carries the kind of dispositive weight that the appellant's counsel is placing upon it. I think there's a lot of other factors to look at. The movement in particular, the agitation, I think would be equally important. Also the fact that the officer really had no way, as you pointed out, he couldn't really turn around and he had had the experience, as he said in his deposition, of once trying to back off from an individual gun and tripping over a couch. That all had to be weighing on his mind and it was certainly very reasonable for that to be the perception. I know I wouldn't have wanted been trying to back out of that situation. I would never have taken my eyes off Mr. Tucker. I mean, I would have been looking right at his face. I just think it's very reasonable for the officer to have done the same and to have perceived that he was in great danger at the time. It's very hard for us here looking at it now, I think, to have any grip on what the officer must have been feeling at that time. That's an important feature that has to be avoided. We have to perceive what he could have perceived. Can I follow up on that point then? Certainly. Because your friend on the other side says the facts are pretty much in agreement. I don't think we have any significant material of facts that any of us disagree about, but she says there's inferences to draw from the facts we question whether the officer acted reasonably. Question for the jury to decide rather than three of us. Because it's a question of what could the officer have believed is what the threshold is and they have to make it into a situation where the officer could not reasonably have believed in the circumstances that he faced that he was in immediate danger. That's a pretty high threshold and I don't think the evidence, if you look at that video, gets you to that threshold. It's not would a reasonable officer, it's could a reasonable officer have perceived that danger. Counsel, what would you say of our Sixth Circuit case law is the closest factually to this case? I think Thornton versus City of Columbus is close because it mentions that an officer shot fired first. I'd also look at the Nelson case and the Mullins case, where in both cases the weapon had been thrown away, yet they shot. And I note in the Mullins case, as I read the description in that case, the officer actually had been on the suspects back when the gun was thrown, then stood up, took that amount of time, and then shot. I thought that a very interesting fact. The other thing I would note is that in the Hicks versus Scott case, which is the one that appellant's counsel particularly emphasized in their brief, in that case the one officer shot. The other officer, if you read the description in that case, had the presence of mind, instead of shooting, to reach out and grab the barrel of the gun. I expect that that officer was going to try to deflect the barrel. So even in that circumstance where that was clearly possible to have been done, the shooting was still considered to be within the bounds of what is constitutionally permissible. So you're citing those cases, I take it for the point that the position of the gun, at least in those cases, was not dispositive. That's correct. Whether or not it's a jury question. That's correct. And how do you explain the King case, King versus Taylor, which denied qualified immunity on the grounds that he was not pointing a gun at the officers? Well, as I recall, give me just a moment. King versus Taylor, in that case they had a situation where, as I recall, the shot was fired from outside the house through a window. And there was forensic analysis after the fact, which we don't have any such thing here, that pointed out that the positioning that was being argued wouldn't even fit with what the actual facts were. In this case, we have the situation, we've got the video, we know what the facts were. As has been pointed out, the facts can be seen by the court. And so I don't think that the King versus Taylor case really has much impact on this particular case. I'm struggling with the position of the weapon. I understand the difficulty of this situation, and we have to credit this officer with trying hard to speak to Mr. Tucker. But the gun had moved beyond any position of firing and was pointed to the ground. Backup was immediately out the door. He had just said, how far away are you into his communications device? What made this fall? Why is this not violated by our case law that looks to the position of the weapon relative to the officer? Well, first, as I've discussed, there's a number of cases where the weapon was clearly not in a position to be fired. And in those cases, they still granted qualified immunity to the officer. As to the position of the gun at the time, again, it comes down to this being a shotgun. Now, again, I am no expert on shotguns, and I would be misleading the court if I tried to make bold propositions about what you can and can't do with a shotgun. But my understanding of a shotgun is that if you could slip that hand down and pull that trigger, you'd have a very wide spread of shot, I guess it's called, that could spread a considerable distance, even in those circumstances where it is pointed at the ground and close to it. At least that would be my understanding of it. As far as the backup, they had said that the backup was on the way. They gave him no impression as he's standing here with this guy that he knew when backup would arrive. He wanted that backup to arrive because then he figured they'd be able to contain the situation and take him to a hospital, which was his intent. But, you know, he couldn't, assuming, you know, knowing the backup was coming wasn't enough to really assuage the situation where he's sitting there or standing there face-to-face with a man with a shotgun still taking these half steps toward him. You know, it's been very presumptuous on his part to think that the backup was going to walk in the direction that it was going to. Mr. Curlew, Ms. Heenan, I believe, said that she thought the Bugis v. Mattingly was the closest case, factually, at least in a parallel sense to this case. How would you distinguish that case from this one? I'm having trouble remembering what the Bugis v. Mattingly case is. There's so many. I know that they cited it rather preceptorally in their brief, and I don't remember them going into actual facts on that one, so I'm going to have to just tell the court that I am not immediately able to address that particular case amongst the others. I do have a copy here somewhere I could try to grab. No, we can read it. Do you—it cited, importantly, to Brandenburg the peace warrant case where they were trying to serve a peace warrant and came out of their cars holding shotguns. Do you—and Brandenburg then got a shotgun out of his truck. Do you remember that one sufficiently? I do. In that case, as I recall, the officers were crouched behind police vehicles. They had cover. They weren't in a small room hemmed in between a coffee table and a TV stand with a dog loose. They were in a position where they actually had cover for themselves when the suspect picked up his gun and fired from undercover. That's a rather different situation than what was faced by Officer Rombach. But different in a way that would— Well, if Officer Rombach— Wouldn't the difference aid Mr. Tucker's case? Because in Brandenburg, he had fired shots, and here we have none of that threat to safety. Right. But if you're behind the cover of a police car, I mean, perhaps this would be different if Officer Rombach were hiding behind the refrigerator. But even that seems a lot less protective. I mean, if you're in behind your police car, that's a lot of metal between you and the guy firing the shots. And you can duck down, and I just don't really see that as being parallel to a situation where you're standing with nothing between you and the gentleman with the gun. Further questions? Thank you, Mr. Carlow. Ms. Haney, you have your rebuttal time. I think you're on mute. Excuse me. Thank you. First, to the question of knowing that the backup officers were on the way. As I heard the radio communication, and as I've seen it, which is an exhibit to this case transcribed, he was told exactly where the officers were coming from. And he knew the county well, and he knew the locations that they were coming from. And as a 18-year, 20-some-year deputy, I think that he was able to know that they were just moments behind him. Another thing I didn't mention before is think about what Rombach said as soon as the first backup got there. He said, he drew a weapon on me, and I didn't know what to do. That doesn't indicate to me that he's acting like an objective, reasonable officer. He's panicked, which is not what a trained officer is supposed to do. Now, I want to address the Nelson case and the Mullins case. Those are very different situations, and I tried to distinguish that when I talked about how it might have been okay for Rombach to shoot Tucker when Tucker first picked up the weapon, because in the, I believe it was the Nelson case, where the officer and the suspect had been struggling, it wasn't the fact that he threw away the weapon that caused the officer to shoot. It was the fact that he pulled the weapon out from underneath him with his hand on the trigger. That's when the officer got up, drew his own weapon, and fired. And it was in the interval while he was getting up and preparing to fire that the weapon was thrown away. The officer did not have the opportunity to perceive that the weapon was no longer a danger. Also, in that case, there was another suspect, and there were bystanders, and that obviously is not a case here. There were no bystanders. There was no one else in danger. Rombach never mentioned the dog. As far as I know, Rombach never saw the dog. And in terms of the, you know, the furniture, I mean, there's nothing to distinguish that from any other situation where a officer is dealing with someone with a gun in the house. And again, I think that, Judge Strange, you've hit on the most important issue, which is that, you know, Rombach wasn't looking at the business end of the shotgun. It wasn't anywhere near in a position to be fired at him. And again, Rombach's weapon was aimed directly at Tucker's chest. If Tucker had made the slightest move to actually use the weapon, which he hadn't done already for 10 seconds, then Rombach still had the opportunity to protect himself. How long do you think the time period is for that the totality of the circumstances must look at? This is a very short time period here from the moving the gun down, pointing it down. How long, what is the time frame for the immediate analysis in this case? According to the defendant's timeline of the video, which was included in their district court brief, and I incorporated into my brief here, that was either 10 is about 10 to 11 seconds from when the barrel of the gun was pointed at the floor until when Rombach shot. And again, as I had said, there was no, there was nothing about the movement that was any different than what was going on. And I think it's interesting that neither the district court nor the defendant articulated what it was about that movement. The movement was just the only thing they had to justify the shooting after the fact, in my opinion. Any further questions? Well, we thank you both for your arguments and your good briefing to help us. The case will be taken under advisement and an opinion will be issued in due course. Ms. Fultz, will you close court, please? Yes, I will. This honorable court is now adjourned.